Gertrude **BONIME** and Lillian Olden, Plaintiffs,

v.

John C. **DOYLE** et al., Defendants.

No. 73 Civ. 5117.

United States District Court, S. D. New York.

June 30, 1976.

Wolf, Popper, Ross, Wolf & Jones, New York City (Benedict Wolf, Robert M. Kornreich, New York City, of counsel), for plaintiffs.

Diamond & Golomb, P. C., New York City (Irving Golomb, New York City, of counsel), Steptoe & Johnson, Washington, D. C. (George B. Mickum, III, Washington, D. C., of counsel), for defendant Canadian Javelin Limited.

Martin Ozer, New York City, Moses Krislov, Cleveland, Ohio, for defendants John C. Doyle and William M. Wismer.

Squadron, Ellenoff & Plesent, New York City, Robert Plotkin, Aram A. Hartunian, Chicago, Ill., for objectors.

LASKER, District Judge.

This is an application pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for approval of a proposed settlement of a class action. The merits of the plan are vigorously pressed by counsel for the plaintiff class and defendants and are challenged with equal strength by various objectors, some of whom have an interest in two similar suits currently pending in the Illinois state and federal courts. Upon detailed review of the arguments and the testimony at hearing and the documents submitted by each side, it is our conclusion that the settlement is fair and reasonable and should be approved.

## I.

### The Nature of the Action, the Parties and the Proceedings to Date

This action was commenced in December, 1973 against Canadian Javelin Limited (Javelin or the company), a Canadian corporation primarily engaged in the business of exploring and developing natural resources whose stock is traded on the American Stock Exchange, and two individuals who figure prominently in its management. The complaint, filed on behalf of all purchasers of Javelin stock from a point in early 1969 to late 1973, alleges violations of Sections 5 and 17 of the Securities Act, 15 U.S.C. §§ 77e and 77q, Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5 by means of a course of conduct designed artificially to inflate the price of the company's stock which was never registered pursuant to Section 5 of the Securities Act.

The plaintiffs, Gertrude J. Bonime and Lillian Olden, purchased shares in Javelin during the period of the alleged wrongdoing. The individual defendants are John C. Doyle, director, controlling shareholder and Chairman of the Executive Committee of Javelin, and William Wismer, director and President of the company.

The amended complaint particularly charges the defendants with a series of material misrepresentations and omissions in annual reports, press releases and filings with the Securities Exchange Commission and the American Stock Exchange designed to deceive the investing public with regard to Javelin's financial condition and business prospects. (¶ 7) The allegations focus on two projects with which the company was involved during the period in question: a plan to develop a major facility in Newfoundland for the production of linerboard (the linerboard project) and a plan to exploit mineral deposits in the Cerro Colorado area of the Republic of Panama (the Cerro Colorado project). In connection with the linerboard project, the amended complaint alleges that during the planning and construction stage the company issued a continuous series of materially misleading statements as to the true size and anticipated profitability of the project, the true cost and extent of necessary financing involved and "serious obstacles" encountered in bringing the project to fruition, particularly disputes with the government of Newfoundland. (¶ 9) Secondly, it is alleged that at a later time the company misrepresented the status of $4,300,000. asserted to be due from the Newfoundland government in payment for the subsequent sale of the entire linerboard project to the government by showing the amount as a current asset, when in reality the obligation was disputed and the company had failed properly to pursue the matter. The defendants are also charged with engaging, during the same period, in a scheme to deceive investors as to the Cerro Colorado project, which centered on a large copper discovery in Panama, by issuing false and misleading statements as to the company's exploitation rights, the related feasibility studies and the financial arrangements to produce and market the initial output of the project. (¶ 12) The plaintiffs allege that the company's right to develop the ore deposits was highly speculative, that no feasibility studies or arrangements to finance the project existed and that marketing plans were still in the negotiation stage. (¶ 14) It is as-

serted that the above misstatements or omissions resulted in artificially inflated prices for Javelin stock throughout the period and that the plaintiffs and all other purchasers of the stock would not have been required to pay as much as they did for their stock if the true facts had been known. (¶ 16)

The defendants deny all the material allegations.

In April, 1974 plaintiffs moved for and obtained an order directing that a class action determination be made by July 14. By stipulation and order the parties obtained three extensions of this time limit, however, because they required further discovery to reach a judgment as to the appropriate boundaries of the class. When the motion for class action determination was filed in January, 1975, the defendants offered no objection on the condition that the determination would be preliminary and they reserved their right to petition the court to alter, amend or revoke the determination pursuant to Rule 23(c)(1), Federal Rules of Civil Procedure. On the basis of the discovery to that point the plaintiffs proposed a class to include all purchasers of Javelin stock between the dates of April 30, 1969, when the 1968 annual report containing the first allegedly misleading statements was issued, and October 25, 1973, the day on which the American Stock Exchange suspended trading in the company's stock for failure to make full disclosure concerning the copper project in Panama. The latter date was selected because while the suspension was in effect the Securities Exchange Commission filed an injunctive action against the defendants which resulted in a consent judgment providing, *inter alia,* for full disclosure of the company's affairs.

Pursuant to this judgment and prior to the resumption of trading on January 25, 1975, the company issued a letter to its stockholders to comply with the SEC order. On the strength of the presentation of the parties in the moving papers [1] the motion to determine the class was granted on February 7, 1975. Notice to the class was stayed pending further discovery which might affect the parameters of the class or indicate the desirability of creating sub-groups within the class. See, *Wolfson v. Solomon,* 54 F.R.D. 584, 593 (S.D.N.Y.1971); *Fischer v. Kletz,* 41 F.R.D. 377, 386 (S.D.N.Y.1966).

The parties submitted the proposed settlement for the court's consideration in July, 1975. By this time, more than one and a half years since the complaint was filed, considerable discovery had taken place. Plaintiffs' attorneys had examined numerous documents relating to the events which form the subject of the complaint, received answers to one set of interrogatories and deposed four persons who played key roles in the linerboard project, the Cerro Colorado project, or both, including the defendant John Doyle. (¶¶ 14, 18 and 21, Wolf Affidavit, October 8, 1975) On the basis of the facts revealed by this discovery, which indicated that there would be some problems of proof with regard to both liability and damages, plaintiffs' attorneys explored the possibility of settlement. Counsel for the defendants, for their part, though steadfastly denying the merits of the allegations, were also desirous of compromising the action to avoid the expense of continued litigation.

Being satisfied that the proposed settlement was worthy of consideration, the court ordered that notice be given of the class determination and of a hearing to be

---

1. From the affidavit of Robert M. Kornreich, one of plaintiffs' attorneys, it was apparent that the requirements of Rule 23(a) and (b)(3) were met: the class of purchasers of Javelin stock numbered in the thousands, making joinder impracticable; virtually all the questions of law and fact, with the exception of calculation of damages, are common to the class and, thus, clearly predominate over individual issues; the claims of Bonime and Olden are typical of the class, as Bonime bought her shares in May, 1970 at a time when the company was actively engaged in the development of the linerboard project and Olden invested near the other end of the class spectrum, when the additional assertedly fraudulent activity regarding the Cerro Colorado project took place; the plaintiffs' attorneys are eminently well qualified, and experienced counsel in litigation of this nature; and the class action was superior to other available methods for adjudication of this controversy.

held on the fairness of the settlement. The order provided for notice by mail and publication. Prior to the hearing the proponents of the compromise filed affidavits and memoranda in support thereof and a total of eleven class members who opposed it submitted their objections in writing.

At the hearing on the merits of the settlement the proponents offered the expert testimony of Dr. Roger F. Murray, S. Sloan Colt Professor of Banking and Finance at the Graduate School of Business and Finance at Columbia University, on the question of provable damages should the plaintiffs prevail on the issue of liability at trial. Several objectors appeared and spoke against the settlement. Those objectors who have an interest in the concurrent Illinois litigation appeared by counsel and strenuously argued that the proposal be disallowed. Their counsel cross-examined Dr. Murray and presented a computer study to demonstrate that the potential recovery of the class was far in excess of that estimated by Dr. Murray and the proponents, and that the sum offered in settlement was therefore grossly inadequate. Both the proponents and the objectors have, with court permission, submitted further affidavits, briefs and data in support of their respective positions.

## II.

*The Proponents' View*

The affidavit of Benedict Wolf, lead counsel for the plaintiff class, sets forth in detail the facts upon which he contends that the settlement is fair. It is his view that, as discussed in detail below, it will be difficult to establish liability with regard to the first portion of the class period and that the possibility of success is more promising, but by no means assured, as to the later part. Even assuming that liability is shown, however, he appears generally to accept the analysis of the defendants' expert, Dr. Murray, who calculates that the maximum recoverable damages to this class is $2.5 million. In a separate affidavit, Dr. Murray sets forth the basis for this state-

ment. A summary of their presentations follows:

Discovery revealed that the allegations of the complaint relate to two distinct segments of time. During the first portion of the class period the defendants' activities centered on the development of the linerboard project; during the later part, the focus of activities was the Cerro Colorado project, and also the alleged misrepresentation as to the payment for the linerboard sale took place. With regard to the first period, the defendants are charged with misleading the public as to the prospects and progress of the linerboard project, undertaken with the consent and close involvement of the government of Newfoundland. The plaintiffs learned, however, that during this period the project in fact proceeded substantially on schedule and within the original budget estimates; that such obstacles as existed were arguably insignificant; and, although not disclosed by the company until issuance of a letter to its shareholders of May 31, 1972, the difficulties were the subject of a great deal of publicity in both Canadian and American media. Finally, it is asserted that Javelin's silence on the problems, which grew out of a dispute with the government that had developed into a political controversy in the Province between the two leading political parties, could very plausibly be defended as an exercise in sound business judgment as the project was dependent for its ultimate success on the good will of the government. Discovery also revealed that no liability could be established as to the Section 5 claim since there had been no public offerings of the unregistered securities within the applicable limitations period. (¶¶ 51–63; 82–84, Wolf Affidavit, October 8, 1975)

The case appears stronger with regard to the period following the May 31 disclosure, during which the bulk of the alleged wrongdoing occurred. In Wolf's view, however, even here the allegations that the company misrepresented the existence and content of encouraging feasibility studies by outside experts regarding the prospects for the Cerro Colorado project proved to be without

foundation in fact. (¶¶ 36–39; 79, Wolf Affidavit, *supra*) He professes greater confidence in proving misrepresentations and omissions as to the other aspects of this project, the status of the exploitation rights and of the preliminary marketing arrangements and an episode regarding the premature announcement of another concession in Panama, as well as the treatment of the $4.3 million owing from the government of Newfoundland for the purchase of the linerboard project. His discussion of the facts, however, conveys the distinct impression that any assessment of success must take serious consideration of the defendants' assertion of the truth of all the statements made, or the existence of a reasonable basis for them which seriously undercuts a claim of willfulness or recklessness.

For example, the allegation of misrepresentation with regard to the marketing arrangements for the Cerro Colorado project was undercut by the fact that very serious discussions were indeed underway with a major British concern at the time of the allegedly misleading releases which, though arguably unduly optimistic—or rather, not fully enough qualified—made no untrue statements, were by no means manifestly misleading, and in fact did not, as alleged, convey the false impression that marketing arrangements had been solidified. (¶¶ 41–47; 81, Wolf Affidavit, *supra*) At trial the plaintiffs will thus have to convince a jury that the statements violated the law in a somewhat subtle degree, obviously a far more risky proposition than proving a patent lie. Similar problems existed particularly with regard to a claim that the company had prematurely announced the acquisition of another mineral concession in Panama. (¶¶ 48–50; 80, Wolf Affidavit, *supra*)

Even assuming that the plaintiffs do succeed in establishing securities law violations, they must, of course, prove damages. According to Wolf, the weakest aspect of the case on damages is, again, the early part of the class period, where proof of any damage at all is made difficult by the fact that most if not all of the allegedly withheld information was publicly available through the media due to the highly publicized political dispute in Newfoundland centering on the relations between the company and the government. Thus it could plausibly be argued that the price of the stock throughout this period reflected the adverse information. The problem of proof of damages is further complicated by the fact that on the first day of trading following full disclosure by the company on May 31, 1972—trading was suspended from early March, 1972 to August 11, 1972 as a result of the sale of the project to the government of Newfoundland—the price was actually higher than the price when suspension began. (¶ 87, Wolf Affidavit, *supra*)

With regard to recoverable damages for the later period, Wolf largely defers to the opinion of Dr. Murray. (¶¶ 89, 92, Wolf Affidavit, *supra*)

As stated above, Dr. Murray submitted an affidavit setting forth his views and also testified at the hearing. His credentials as an authority on the workings of the stock market are impeccable. His analysis is based on the proposition that distinction must be made between losses attributable to general market forces and trends and losses attributable to "unique characteristics of a particular company," and he assumes that "[i]f announcements and reports issued by the company had an effect on [Javelin's] price, that effect can be measured by the differential price behavior of the shares relative to . . . indexes of market price." (¶¶ 4 and 5, Murray Affidavit, October 7, 1975) In short, he attempts to factor out the amount of money lost by purchasers which is not attributable to general market trends.

To this end he plotted the rises and falls of Javelin's selling price during the class period and compared them to the averages of the same data of two comparable groups of stock, the S & P Low Priced Common Stock and the Value Line Industrial Stocks. He concluded that in gross "the price experience of [the company] differed in no material respects from the price behavior of representative stocks in its risk class." (¶ 12, Murray Affidavit, October 7, 1975)

However, he allowed the possibility that a certain number of investors may have been induced to buy at premium prices by relatively high prices or spurts in market activity with no opportunity to sell before a drop ensued. He described three periods of such "activity premiums," periods in which activity in this security greatly exceeded the norm, and calculated that a total of roughly 2,500,000 shares were traded for an aggregate premium, i. e., price in excess of normal—of $6,013,750. From this sum, he deducted the amount which, by his estimate based on his study of the records of the transfer agent, represented money paid by short-term traders who were in and out of the stock before the price dropped, a group he believes to comprise more than 50% of the excess activity in these periods. (¶ 16, Murray Affidavit, *supra* ) His adjusted total, after all these calculations, is $2,430,-000., a sum which he believes "fully reflects the losses which might have been sustained by investors who were buying . . . with reference to expected developments and not simply to make a quick turn on the market." (¶ 17, Murray Affidavit, *supra* )

The position of counsel for the defense on this application is a simple one. They maintain confidence that they would prevail upon a full trial, but are desirous of settling to avoid the expense entailed in the conduct and preparation of a "long, difficult and complicated" trial. (Memorandum of Canadian Javelin, October 10, 1975 at p. 21) They maintain that in view of the limitations of plaintiffs' chances of success and probable maximum recovery, the settlement is more than fair.

### III.

*The Terms of the Proposed Settlement*

The proposed stipulation of settlement defines the "entire class period" as the period from April 30, 1969 through October 24, 1973. This period is subdivided into a "first period," from April 30, 1969 through May 31, 1972, and a "second period," from June 1, 1972 through October 24, 1973. The first period encompasses the allegations centering on the development of the linerboard

project and the second relates to the later activities. The defendants are to pay $1,350,000. into a settlement fund in such proportions as they agree among themselves. Any payment by the company may be either in warrants for its stock or in cash or a combination of the two; any payments by the individual defendants will be in cash. All class members who sustained a loss shall be entitled to a pro rata share of the settlement fund, with one-third of the fund allocable to the claims of class members who purchased during the first period and two-thirds to the claims of those who purchased in the second period. The weighted recovery reflects the proponents' assessment of the weight of the case with respect to each time frame. A "loss," for purposes of eligibility to participate in the fund, is defined as the difference between the purchase price of the shares and the greater of (i) the selling price of the shares or (ii) the closing price of the stock on the American Stock Exchange on August 10, 1972, the first day of trading after May 31, 1972, in the case of the first period, or on January 27, 1975, the first day trading was resumed on the American Stock Exchange after October 24, 1973, in the case of the second period. Profits earned from a sale of any stock which was purchased during the entire class period up to the date of mailing of the notice of the hearing are to be deducted from losses in computing the claim of each class member. In the event of approval counsel for the plaintiffs will apply to the court for a fee of $260,000. plus expenses to be paid out of the fund.

Matters left open by the terms of the stipulation were finalized prior to the hearing: as between the three defendants, Canadian Javelin, by an action of the Board of Directors, has undertaken to pay the entire amount of the settlement fund in cash.

### IV.

*Objections*

Of a class which numbers in the thousands only eleven individuals have voiced objections to the compromise. Three objectors, (the Lurie group or the Luries) have

launched a well organized and rather acrimonious assault on the proposal. It is with their contentions that this portion of the memorandum is primarily concerned. The other eight, raise an assortment of issues challenging the substantive fairness of the plan which are dealt with at the end of this section.

 The general principles which guide us in assessing the fairness, reasonableness and adequacy of a class action settlement are clear.

"[T]he role of a court in passing upon the propriety of the settlement of a . . class action is a delicate one . . . since ' "[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation, the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial'." ' Rather . . . it must reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and 'form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.' " *Newman v. Stein,* 464 F.2d 689, 691–92 (2d Cir.) *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); (citations omitted).

At the heart of the analysis is an evaluation of the strength of the plaintiffs' case. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir. 1974). This requires consideration both of the likelihood of establishing liability and the consequent probable reward in damages, balanced against the amount offered in settlement. *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 740–41 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir. 1971). Preliminarily, however, we must first consider a variety of procedural objections raised by the Lurie group, for considerations of the conduct of

the settlement proceedings are also relevant to a determination of the fairness of the plan. *Newman v. Stein, supra,* 464 F.2d at 692 and n. 8.

**A.** *The Objections of the Luries*

Faye Lurie and H. Haskell Lurie are the named plaintiffs in two similar actions, one in state and one in federal court, against these defendants in Chicago, Illinois.[2] Those actions allege very much the same wrongs as set forth in the complaint in this case and also purport to be class actions, although the proposed class periods are somewhat shorter. In neither has a class determination been made. Such a motion is currently pending, however, in the state case along with cross-motions for partial summary judgment.

Both of the Luries' cases were filed at approximately the same time as this one, in late 1973, so the Luries, too, have had an opportunity for fairly extensive discovery. Unlike the discovery by counsel for plaintiffs in this case, however, the Luries have been limited in their investigation of the merits of the case to examination of documents and answers to interrogatories. (¶ 5, Plotkin Affidavit, September 25, 1975) Moreover, the Luries' lead counsel, Robert Plotkin, engaged in settlement discussions with defendants' counsel during the period of such discussions in this case.

**1.** *Procedural Objections*

The Luries contend that this settlement proposal is defective on account of several alleged procedural flaws in its development and presentation to the class. They claim that contrary to the Recommendations of § 1.46 of the Manual for Complex Litigation, a tentative class for settlement has, in effect, been created here; that the Notice of Class Determination, the Proposed Settlement and the Settlement Hearing (the Notice) was misleading in not explaining this fact and in misrepresenting the status

---

**2.** In fact, the Luries have opted out of this class, leaving their status as objectors somewhat open to question. Subsequent to the hearing counsel for Javelin filed a motion to strike their objection on this ground, but the

issue is rendered academic by the fact that the third objector in this group, Sally Einstein, is a class member and clearly has standing to complain of the proposed compromise. (See Einstein Affidavit, November 21, 1975).

of the Chicago litigation; and that the Notice imposed undue burdens on class members who desire to object to the settlement or to opt out. Finally, a persistent theme in the arguments of the Luries' attorney is that this settlement is the product of excessive bargaining leverage by the defendants, asserted by virtue of their ability to play the two attorneys, Plotkin and the class attorneys in this case, against one another and thereby obtain an unreasonably low settlement figure.

■ We disagree that a tentative settlement class has been formed in this case. The motion for class determination was granted in February, 1975, fully five months before the settlement was presented to the court, and if the settlement were disapproved, the class determination would remain in effect. See generally, 1 Pt. 2 Moore's Federal Practice, Manual for Complex Litigation, § 1.46 at 54–57 (1975). It is true, however, that the motion was granted on consent of the defendants and subject to their right to raise objections at a later date. The order was thus conditional and subject to later revision, as it is expressly permitted to be by Rule 23(c)(1), and consequently there is arguably some similarity to the tentative class procedure criticized by the authors of the Manual. One of their concerns is the possibility that parallel settlement negotiations may be conducted with different purported class representatives. Apart from this problem, which we treat separately, the force of the Manual's critique of tentative classes has been considerably muted in this Circuit. In *City of Detroit v. Grinnell Corporation, supra,* 495 F.2d at 465–66, the Court indicated that the principal concern of this portion of the Manual is satisfied where, as here, the class members receive an opportunity to appear at a hearing and challenge any aspect of the proposed settlement.

■ In light of the above, we disagree that the Notice was inadequate for failure to inform the class of the use of an allegedly tentative settlement class procedure. We also disagree that the Notice misrepresented the Chicago litigation. The Notice stated:

## "OTHER LITIGATION

After this action was commenced, two stockholders started an action in the Federal District Court in Chicago (*Faye Lurie, et ano. v. Canadian Javelin Limited, et al.,* 73 C 3086) based generally on the same issues as are involved in this action, which case has remained dormant, and another action in the Circuit Court of Cook County, Illinois (*Faye Lurie, et ano. v. Canadian Javelin Limited, et al.,* 73 CH 7442) also based generally on the same issues as are involved in this case. In the latter action plaintiffs moved for a class action determination under Illinois Rules and for partial summary judgment and defendants cross-moved for complete summary judgment. The class action motion has been pending since July 12, 1974 and plaintiffs' partial summary judgment motion has been pending since December 24, 1974, both without determination."

Although the Luries object to the use of the word "dormant" to describe the federal case in Illinois, their papers make clear that the state case has been the focus of their attention to date. It is in the latter action that the class determination and summary judgment motions have been made, and apart from their disputed claim that the discovery which forms the basis for these motions applies as well to the federal case, the Luries point to no independent activity in that action. There is a sharp controversy in the affidavits before us on the existence of an agreement among counsel that discovery in either case may be used interchangeably in both, a controversy which we cannot and need not resolve on this record. Whatever the truth of the matter, the important fact is that the Notice revealed the existence of both cases and any concerned class member could have inquired further had he desired to do so. Even accepting the Luries' contention that they are proceeding with the intent fully to prosecute both actions, the description in the Notice may not fairly be characterized as a misrepresentation; at most it is an inaccuracy far less serious

than would be required to undermine a settlement.

The Notice required that to object to the settlement, a class member must "file a notice of intention to appear and a statement of the basis for objection, together with a memorandum of supportive authorities," and that to opt out, a class member must, in addition to simply requesting exclusion, provide data as to his purchases and sales of the company's stock. The Luries contend that these requirements create unnecessary burdens which discourage class members from exercising their rights. We recognize that such requirements may discourage objections or opting out of the class—although this would be disadvantageous, not advantageous to remaining members. We cannot agree, however, if indeed the Luries seriously mean to suggest it, that the inclusion of such requirements should bar approval of the settlement if it is otherwise fair and reasonable.

During the period in which the parties to this action were engaged in the discussions which ultimately led to the proposal under consideration, Plotkin was also attempting to work out a compromise of the Luries' actions. He was unsuccessful and now hints darkly that this settlement, if not collusive, is the product of the opportunities for coercion which inhere in a situation in which more than one class action is brought against defendants on the same cause of action.

The circumstances in which the instant settlement proposal was developed, with both Wolf and Plotkin contemporaneously attempting to resolve their respective suits, resemble the situation criticized by the Third Circuit Court of Appeals in *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (1971), where in a single purported class suit and prior to the designation of a class representative, defense counsel engaged in discussions with two different attorneys who both aspired to represent the class. The court observed that:

"a person who unofficially represents the class during settlement negotiations may be under strong pressure to conform to the defendants' wishes. This is so because such an individual, . . . knows that a negotiating defendant may not like his 'attitude' and may try to reach a settlement with another member of the class."

\* \* \* \* \* \*

"The attorneys' fees and the prestige attendant upon probable appointment as class representative are the rewards for the attorney who bargains successfully with the defendants." *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971).

The possibility that events transpired as Plotkin alleges is a troubling one, and it is the more so because, in contrast to the situation in *Ace Heating,* the possibility arises not out of premature settlement negotiations in a single class action, over which a court could exercise a considerable measure of control, but out of the pendency of more than one suit in two entirely different jurisdictions, a situation which seems largely beyond the power of a court to prevent. This is, however, simply one of a number of novel and knotty problems arising from the unique attorney and client relationship in class action litigation, where with much more frequency than in traditional litigation the interests of a class attorney may diverge from that of his clients. See, e. g., *Saylor v. Lindsley,* 456 F.2d 896, 900–01 (2d Cir. 1971). Moreover, it by no means follows from the fact of contemporaneous negotiations of the two cases that undue leverage was exercised by the defendants against either group. Perhaps as courts become increasingly sensitive to the myriad complexities of class litigation these problems will be earlier perceived and, to the extent possible, headed off in the process. Confronted with these contentions at this stage of the proceedings a court must assume the burden to insure that the interests of individual class members are protected and be "doubly careful" in assessing the merits of the plan; see *Ace Heating & Plumbing Co. v. Crane Co., supra,* 453 F.2d at 33; and see *Saylor v. Lindsley, supra,* 456 F.2d at 900–01; but it would not be in the

interests of the class to disapprove a settlement merely because the possibility of abuse existed if the proposal itself is fair and reasonable. As explained below, our examination of the merits of this agreement leads us to conclude that it is fair and reasonable and, consequently, that it is not the product of untoward negotiating leverage.

### 2. Substantive Objections

The Luries vigorously contend that this settlement is grossly unfair to the class. The case is so strong on liability, they claim, that "it is difficult to conceive how the defendants could possibly win." (Lurie Memorandum, filed September 26, 1975 at 8) Damages are asserted to range from 30 to 50 million dollars.

That both contentions are substantially exaggerated is evidenced not only by the persuasive submissions of the proponents of the compromise, but by the disparity between the actions and bargaining positions of the Luries' attorney, Robert Plotkin, prior to the time this settlement was agreed upon and his subsequent claims. Indeed all the arguments so energetically advanced are considerably dimmed by the shadow of the fact that at the time he was negotiating for a settlement, Plotkin was discussing a figure of $2 million as the basis for settlement of the Illinois class litigation. (Tr. 125; ¶ 2(d), and Ex. 3–J, Plotkin Affidavit, supra) Assuming the accuracy of his statements about the likelihood of success, the figure suggests a much lower estimate of possible damages; on the other hand if his damage estimates are realistic, it suggests an evaluation of his chances of success considerably less sanguine than he now maintains. In fairness to Plotkin it does appear that this figure was always a tentative one. (Exs. 3–E, 3–J, Plotkin Affidavit, supra)

Nevertheless the vastness of the difference between it and the figures he now claims to be the likely range of recovery is exceedingly striking. Indeed, the inference is inescapable that his present contentions are heavily colored by the threat that the prospect of approval of this settlement proposal poses to the viability of the Lurie litigation insofar as the Luries hope to represent a large class of investors.

In support of the somewhat extraordinary assertion about the strength of their case the Luries have submitted almost nothing of probative value.[3] Annexed to the pre-hearing papers were copies of the complaints in their two cases, a proposed amended complaint in the federal action, the SEC's complaint in a related case, and their proposed order granting them partial summary judgment as to liability in their state case. These conclusory and argumentative documents shed no light whatsoever on the question before the court.

It is true that the attorney who appeared for the Luries at the hearing, Aram Hartunian, was prepared to make "copious" reference to the record in the state case in Illinois, particularly to the motion for partial summary judgment, in speaking to the strength of the claims in that proceeding. (Tr. 65–68) We declined to permit this. To have done so would have required this court to consider the merits and review the record in the current Illinois litigation and invited dispute with the other parties as to the differences and similarities between the two cases. Moreover, the failure to include even a scrap of substantive documentary material going to the strength of the case in their hefty pre-hearing submission, which would have been the appropriate manner to present the argument to this court, created the distinct impression that their offer of proof was more in the nature of a dilatory

---

**3.** At the end of their post-hearing memorandum, the Luries provide a brief excerpt from Javelin's contract with the Panamanian government which tends to undermine the company's claim that its announcements regarding its right to exploit the Cerro Colorado copper were based on a good faith interpretation of the terms of the contract. (Post-Hearing Memo-

randum, November 3, 1975 at 38–40) It is, of course, impossible to assess the significance of this single item, but even accepting it at face value, it is by no means inconsistent with the position of counsel for the plaintiff class which is that this is the strongest of the several allegations in the complaint. See p. 1377, supra.

tactic than a good faith effort to aid the court in its determination. If Plotkin is correct that all material in his Illinois motion is applicable here, the proper course would have been to submit such material in an affidavit in opposition to this settlement.

The Luries again urged us to consider the summary judgment papers from the other case in the very substantial post-hearing material which was primarily directed at the question of damages. Although we recognize that there is authority in precedent, as well as common sense, for the proposition that it may be useful in assessing the strength of a case for a court to examine the record in related proceedings, *State of West Virginia v. Chas. Pfizer & Co., supra,* 314 F.Supp. 710, 741 (S.D.N.Y.1970), *aff'd* 440 F.2d 1079 (2d Cir. 1971), we continue to believe that it is not warranted in the present circumstances. First there is a significant, though perhaps not dispositive distinction between the kind of record available to Judge Wyatt in the *Pfizer* case and that being offered here. Judge Wyatt had the entire record in two cases, both of which had proceeded to the appellate stage. Such material is far more reliable as an objective source of information than such adversary documents as the briefs and exhibits in support of a motion for summary judgment, which much more often than not prove only that triable issues exist—a proposition which we do not doubt here. Second, we have most carefully studied the material which these objectors have submitted in support of the other half of their claim—that damages in this case are from 30 to 50 million dollars—and have concluded, as discussed below, that the figures are excessive in the extreme. The experience leads us to view with considerable skepticism the Luries' claim that another voluminous round of papers, copies of a motion which has now been pending in another court for 17 months with no disposition, will demonstrate that the case against these defendants is air tight. Finally, and perhaps most important, even if we grant the objectors the benefit of the doubt and assume

that the case against these defendants is a good deal stronger than it appears from the submissions of the proponents (although we must discount as puffery their assertions of the inevitability of success), we find that the recoverable damages to the class are much closer to the $2.5 million figure asserted by the proponents to be the maximum recovery than the $30 to 50 million figure of the objectors.

As indicated above, the material submitted by the Luries in rebuttal of Dr. Murray's damages analysis and in support of their own much larger figure is extensive. It includes the results of a computer study which purports to measure total losses to the class based on four alternative models of stock holding period patterns, an affidavit by Dr. Andrew J. Senchack, Jr., Assistant Professor of Finance at the University of Texas, which criticizes the methods and conclusion of Dr. Murray, and a very substantial post-hearing memorandum. The thrust of all this is that damages to the class range from 30 to 50 million dollars and that a fair settlement would range from $7½ to 10 million. The latter figure is derived by taking a "conservative" damage estimate of $30 to 40 million, cutting it in half on the "generous" assumption that this many class members won't file claims, and then granting a 50% recovery to the class based on Plotkin's long-standing position that class members should ideally recover 50¢ on the dollar for their loss. (Post-Hearing Memorandum, November 3, 1975, p. 35) The logic of these calculations is nowhere explained.

The fundamental defect of this approach is simply stated: The calculations are all designed to estimate *gross losses* to the class, that is the aggregate amount of money investors during the class period have lost, without regard to the causes of the loss. (Post-Hearing Memorandum, *supra,* at 7–8) This, however, is an entirely distinct question from that of recoverable damages. It is elemental that a plaintiff can recover only that part of a given loss which is attributable to the defendant's wrongful conduct.[4] See *Cutner v. Fried,*

4. We reject the assumption implicit in the Luries' approach, finally made explicit in the Post-Hearing Memorandum at page 8, note 1, that all (or gross) losses are recoverable damages in

373 F.Supp. 4, 12 (S.D.N.Y.1974). Application of this principle in market manipulation cases poses problems of extreme complexity, but this is no justification for dispensing with it altogether. Because their basic premise is in error, the Luries' computations, however accurate or interesting, are simply inapplicable to the question before us.

Although it is easy to point out the flaw in the figures submitted by the Luries, it is exceedingly difficult to determine the amount of damages the plaintiff class would recover should they prevail at trial.

■ At the outset, the proper method of calculating damages in cases such as this is far from established. It is generally accepted that the theoretically preferred measure of damages in 10b–5 cases is the out-of-pocket rule applied in the common law tort action of deceit. *Harris v. American Investment Co.*, 523 F.2d 220, 224–25 (8th Cir. 1975) and cases cited there. Cf. *Tucker v. Andersen & Co.*, 67 F.R.D. 468, 482 (S.D.N.Y.1975). See generally, Note, Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities, 26 Stan.L.Rev. 371, 383–85 (1974) [Hereinafter Note]. By this rule a plaintiff's damage is determined as of the date of the purchase by subtracting the actual value of the security from the purchase price. Any attempt to ascertain the actual value of a publicly-traded security at a prior purchase date necessarily entails such a large element of speculation, however, that some courts have suggested fixing the actual value at the price of the security at some post-transaction date when full disclosure has been achieved. *Harris v. American Investment Co., supra*, 523 F.2d at 226–27; *Tucker v. Andersen & Co., supra*, 67 F.R.D.

at 482; and see Note, *supra*, 26 Stan.L.Rev. at 374–77 and 383–85. While this course has the obvious attraction of providing a concrete figure for the true worth of a security absent the fraud, it completely disregards the many other factors which influence price fluctuation over time of stocks in general or of a particular stock. It therefore has the potential of creating a windfall recovery to a plaintiff in the nature of indemnification against the risks of the vicissitudes of the market, and at the same time saddling defendants with payments far out of proportion to the damage caused by their fraud.

Where the suit is maintained as a class action the complexities of calculating damages increase geometrically. In contrast to the case of a single plaintiff, whose dates of purchase and period of holding the stock are readily available, the entire class of purchasers over a period of years encompasses literally thousands of purchase and sale dates, many of which have significance in ascertaining damage. Many class members may actually have made money on the fraud, by buying at a relatively low price and selling out near the peak; many may have broken even. Moreover, where damages are computed on the basis of the value of the stock at some post-transaction date of full disclosure, there is no way fairly to account for those who sold at a loss prior to that date, since the only non-speculative causes of their loss are market and other factors wholly independent of the fraud.

The myriad obstacles to a fair computation of damages are well-illustrated by the facts of this case. There is nothing in the record from any of the interested parties purporting to provide a reasoned basis for determining the actual value of Javelin stock at any time prior to the dates of full disclosure mandated by the SEC.[5]

this case. The suggestion that this conclusion is compelled by the opinion in *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167 (2d Cir. 1970) is contradicted by the express distinction drawn there between the proper measure of damages where, as in that case, the issue was whether Chasins would have bought from the defendants at all if they had disclosed their interest in the stock, and a case such as this where the issue is whether the defendants ma-

nipulated the market and thereby secured an artificially high price for the stock. 438 F.2d at 1173.

5. Dr. Murray expressly disclaimed use of his testimony or affidavit to ascertain the "true value" of Javelin stock. It is his view that the concept has relevance only to companies whose shares are not actively traded. (¶¶ 4.d and 7, Murray Affidavit, November 26, 1975) Dr. Senchack, the Luries' expert, also declined

If the alternative method suggested in *Harris v. American Investment Co., supra,* is employed, the actual value would be determined as of the two dates on which trading resumed after full disclosure was achieved by SEC mandate, August 10, 1972 and January 27, 1975. Any attempt to figure damages on this basis, however, would have to take account of the fact that the period encompassed by this action, April, 1969 to October, 1973, was perhaps the most disastrous period in the post-1929 history of the stock market. See *Cutner v. Fried, supra,* 373 F.Supp. at 12; *Feit v. Leasco,* 332 F.Supp. 544, 586 (E.D.N.Y.1971). Furthermore, it would be necessary seriously to consider certain peculiarities of Javelin's situation which may well have accounted for a large decline in the price of its stock but might prove demonstrably separable from the alleged fraud. For instance, it is during the first class period, April 30, 1969 to May 31, 1972, that by far the largest amount of loss, calculated by the *Harris* method, occurred.[6] It was during this period, however, that the company was experiencing its well-publicized difficulties with the Newfoundland government over the linerboard project. These facts suggest a strong probability that to whatever extent the drop in the price of Javelin stock from 21½ in May 1969 to 7⅛ in March 1972 exceeded the drop in the stock market generally for comparable securities, it was attributable to the uncertainty over the future of the linerboard project created to a large extent by the political dispute in which the company had become entangled rather than to the fraud of the defendants.[7] (See Letter to the Court of Benedict Wolf, June 14, 1976 at 4–5) Moreover, on August 10, 1972 the first day of trading after the full disclosure on May 31, the stock traded three points higher than when trading was suspended. This fact confounds the entire theory on which the *Harris* formulation is based.

■■■ We are convinced of the practical impossibility of ascertaining the "true value" of Javelin stock on any given date during the class period so as to compute damages according to the theoretically ideal damage formulation. We also believe that the proponents of the settlement are correct in asserting that the *Harris* alternative, whatever its value in other situations, is of no use in reaching a fair damage figure on the facts of this case, at least not without substantial modifications to account for the many other variables affecting the price movement of the stock.[8] Because we ac-

---

to calculate "true value," stating that the task would only be possible upon an exhaustive analysis of the company's business, its books and its personnel. (¶¶ 18–22, Senchack Affidavit, November 1, 1975) The Luries' attorney makes the statement that the "true value" rarely exceeded $3.00 per share during the class period, but offers nothing whatsoever to support that claim and, in fact, agrees that use of the usual out-of-pocket damage formula would "generally be unworkable" in cases such as this due to the difficulty of determining true value. (Note 1, Post-Hearing Memorandum, November 3, 1975 at pp. 8–9).

6. At the court's request counsel for the plaintiffs, for Javelin and for the Luries submitted estimates of damages in this case calculated according to the *Harris* alternative. Their figures are quite similar. The Luries assert that *Harris* damages are $18 to $22 million for the first class period and $14 million for the second. Plaintiffs' counsel set the figures at $25,855,755 and $13,781,061 respectively, while counsel for Javelin estimate damages according to this formula at $27,578,507 and $13,785,776.

(Laycock Affidavit, June 8, 1976; letters to the court of Benedict Wolf and George Mickum III, June 14 and June 11, 1976)

7. A major element of the alleged fraud in this period is the non-disclosure of the problems with the government, which in any event was, according to the uncontradicted statements of the proponents, largely public knowledge. This was only one reason why the plaintiffs' attorneys determined that the allegations focusing on the first class period were by far the weaker part of the case. See 8, 10–11, *supra.* Such considerations, in addition to the general stock market decline during the class period, give serious cause to discount the significance of the very large damage figures produced by application of the *Harris* formula.

8. In connection with the submission of *Harris* damage figures referred to in note 6, counsel for the company submitted a modified estimate reflecting an attempt to factor out at least some of the variables, such as the effect of general market trends and the large number of short term buyers and sellers which must be discounted in arriving at a fair damage figure.

cept the proposition that other traditional damage formulations, such as loss of the bargain, and rescission, are entirely inapposite to cases such as this, see Note, *supra*, 26 Stan.L.Rev. at 374–77; 381–83, we are thus left to our own devices to fashion a fair damage approach.[9]

 We conclude that for purposes of determining the fairness of this settlement, the analysis of Dr. Murray provides a creditable basis for arriving at an estimated range of potential recovery. Although not without its theoretical difficulties, the approach avoids most of the pitfalls of the methods discussed above and appears successfully to derive a damage figure which distinguishes that considerable part of Javelin's price fluctuations attributable to general market forces from that which could arguably be caused by the alleged misrepresentations. Even allowing for the possibility that his method over-compensates for these external factors, if the recoverable damages were, say, twice what he claims, we think the settlement is well within the range of reasonableness. Viewed another way, the only statement about recoverable damages which can be made with anything approaching confidence at this point is that the figure is somewhere between Dr. Murray's figure of $2.5 million and something less that the $12.8 million figure submitted by counsel for Javelin as partially adjusted *Harris* damages. See note 8, *supra*. Because we agree with proponents' counsel that even this figure fails to take account of significant factors which would further substantially reduce the recovery, see note 8, *supra*, we are prepared to believe that any ultimate figure derived from this formula would be significantly lower, and given the complexities and uncertainties which confront plaintiffs if this litigation is pursued, and the time and expense to all concerned which this would necessarily entail, we think that the settlement figure is a reasonable one.[10] Cf. *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 455 and n. 2.

### B. The Other Objectors

 Apart from the Luries, eight class members—including two married couples—challenge the substantive fairness of the settlement on an assortment of grounds which can be dealt with rather briefly. Several mistakenly understood the plan to exclude from participation any purchaser during the class period who failed to sell his shares. However, anyone who bought during the class period and suffered a loss is entitled to share in the fund and the loss of non-sellers is measured by the price of the stock on the first day of trading after full disclosure. Two of these objectors com-

Their adjusted estimates are $9,946,000 for the first class period and $2,937,000 for the second, or a total damage estimate of $12,883,000. (Letter of George Mickum, *supra*, June 11, 1976) We think that the modifications applied by the company's counsel to the raw *Harris* figures were appropriately made, and agree further that even the adjusted figure of $12,-880,000 must be considered too large, as it takes no account of such factors as the very high turnover rate of Javelin stock, the thousands of different holding period patterns of the class members and the resultant variety of overall profits and losses sustained, and, most importantly, of factors peculiar to the company but independent of the alleged fraud, such as the dispute with the government of Newfoundland. (See Mickum letter, *supra*, at 6–9)

In addition, in view of the assertion of plaintiffs' counsel that the chances of establishing liability as to the first class period are remote, almost $10,000,000 of the figure must be considered highly speculative.

9. The extreme difficulty in reaching a fair damage figure were this case tried (and liability shown) is itself a factor which heavily commends settlement, *Newman v. Stein, supra*, 464 F.2d at 693, as is the prospect of having to determine damages on an individual basis if it were ultimately concluded that class calculation is simply impossible. *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 467.

10. We see no inherent incompatibility between accepting Dr. Murray's conclusion as a reasonable estimate of damages and proceeding to distribute the settlement fund according to a formula which measures loss in a manner akin to that employed by the court in *Harris v. American Investment Co., supra*, 523 F.2d 220. The former represents a sophisticated attempt to calculate damages with precision; the latter, a necessary rough accommodation to the practical realities of distributing the funds.

plained that the settlement did not provide for participation by those who bought Javelin stock prior to the class period and who continued to hold in reliance on the alleged misrepresentations. For better or worse, however, the federal securities laws preclude relief for holders in reliance and their exclusion from the class thus seems not only appropriate but mandatory. One objector expressed dissatisfaction with the possibility of being paid in warrants, but this is now moot in view of the company's decision to pay cash.

Two objectors opposed the provision allowing the defendants to choose among themselves who will put up what portion of the fund. They argue that this allows the two individual defendants, who control the company's decisions and who are assertedly personally responsible for the alleged wrongdoing, to escape accountability while saddling the company with payment. Indeed, it has been decided that the company will do just that. Such a provision, however, is a matter for the defendants to agree upon or not. If they are prepared to do so, and thus assure that an amount which is a fair settlement will be available to the class, then the interests of the class will be protected. Cf. *Percodani v. Riker-Maxson Corp.*, 50 F.R.D. 473, 477 (S.D.N.Y. 1970). (We note that if the decision of the company to pay the entire amount is the result of improper machinations by the individual defendants, the wrong is redressable by a shareholder's action. The impropriety of this decision is cast in serious doubt, however, by the fact that both the individual defendants are indemnified against liability for acts within the scope of their duties, an indemnification which may well cover the wrongdoings alleged. (Tr. 29–30))

The remaining objections are more generally addressed to the fairness and adequacy of the settlement fund.

## V.

*Conclusion: The Settlement Should be Approved*

The narrow question before us is whether this compromise is within the "zone of reasonableness" in view of what we know about the merits of the case, the potential recovery and the consequent risks and complexities of proceeding on through trial. See *Newman v. Stein, supra,* 464 F.2d at 698. The plan appears to us to be within that zone. We credit the presentation of the proponents on the issue of liability, and although we believe there is a good possibility that a trier of fact might arrive at a higher figure of damages than Dr. Murray, we are confident that that figure would be significantly closer to his than to that of the Luries. Bearing in mind that "[t]he evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice," *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 468, we find that this settlement merits approval.

Submit order.