David and Dorothy STEINBERG, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

William Polk CAREY, John L. Gibbons, Estate of Robert M. Morgan, William S. Renchard, Fred R. Sullivan, James R. Webb, Peter C. R. Huang, James V. Tomai, Jr., C. I. Realty Investors, City Investing Company, C. I. Planning Corporation, Reynolds Securities Inc., and duPont Glore Forgan Incorporated, Defendants.

Irving MASON, on behalf of himself and all others similarly situated, and derivatively on behalf of C. I. Realty Investors, Plaintiff,

v.

CITY INVESTING COMPANY, C. I. Realty Investors, C. I. Planning Corporation, William Polk Carey, John L. Gibbons, Peter C. R. Huang, James V. Tomai, Jr., Estate of Robert M. Morgan, William S. Renchard, Fred R. Sullivan, James R. Webb and Reynolds Securities Inc., Defendants.

75 Civ. 1695, 75 Civ. 1811.

United States District Court,
S. D. New York.

April 20, 1979.

Greenfield & Schoen, Bala Cynwyd, Pa. (Richard D. Greenfield, Sterling H. Schoen, Jr., Robert P. Frutkin, Gilbert F. Ashley, Bala Cynwyd, Pa., of counsel), Norwick, Raggio, Jaffe & Kayser, New York City, for plaintiffs.

Kissam, Halpin & Genovese, New York City (Leo T. Kissam, James G. Simms, Peter J. Dranginis, Jr., New York City, of counsel), for defendant C. I. Realty Investors.

Davis Polk & Wardwell, New York City (S. Hazard Gillespie, Mark L. Austrian, James L. Kerr, Andrew C. Jacobs, New York City, of counsel), for defendants City Investing Company, C. I. Planning Corp., John L. Gibbons, James V. Tomai, Jr., and Peter C. R. Huang.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (Hugh N. Fryer, M. Pat Adamski, John J. Langhauser, New York City, of counsel), for defendants Dean Witter Reynolds Inc. and duPont Glore Forgan Inc.

Skadden, Arps, Slate, Meagher & Flom, New York City (Kurt Koegler, Anthony J. Siano, New York City, of counsel), for defendants Fred R. Sullivan, James R. Webb, William S. Renchard, William Polk Carey and the Estate of Robert M. Morgan.

## OPINION

EDWARD WEINFELD, District Judge.

This is a motion made upon published and direct mail notice to all beneficial owners on and before February 1, 1975 of the shares and warrants of C. I. Realty Investors (the "Trust"), a real estate investment trust, ("REIT"), for approval of a proposed class action settlement entered into between plaintiffs and defendants. The gross amount of the settlement is $925,000 subject to deductions noted hereafter. Upon the return of the motion no class member opposed or questioned the settlement and all parties to the litigation and their counsel urge approval of its terms. Since the affidavits and memoranda submitted in support of the settlement review in detail the history and scope of the litigation, familiarity with the issues involved and the contentions of the parties is assumed.

The proposed settlement encompasses two actions instituted by shareholders of the Trust. The first, *Steinberg v. Carey*, was filed on January 6, 1975 in the Eastern District of Pennsylvania, and sought damages pursuant to section 10(b) of the Securities and Exchange Act of 1934 ("Exchange

Act")[1] and Rule 10b–5 promulgated thereunder,[2] on behalf of all those who purchased units, shares or warrants of the Trust from April 13, 1972 to and including July 12, 1972 (the ninety-day effective period) in reliance on the Trust's Registration Statement and Prospectus. The second, *Mason v. City Investing Co.,* was filed in the same district as a combined class and derivative action on February 25, 1975. It asserts claims on behalf of the Trust and its shareholders pursuant to sections 12 and 17 of the Securities Act of 1933 ("Securities Act")[3] and sections 10(b), 13(a) and 14(a) of the Exchange Act.[4] The *Mason* class includes those who purchased the Trust's shares during the period encompassed by the *Steinberg* action and beyond—that is, up to and including February 1, 1975. Both cases were transferred on consent to this district pursuant to 28 U.S.C., section 1404(a). On May 3, 1976, Judge Wyatt dismissed the derivative claims in *Mason* for failure to make a demand upon the Trust's shareholders prior to bringing suit,[5] and stayed all discovery on the class claims pending final determination in *Steinberg;* on August 5, 1976, the *Steinberg* suit was certified as a class action.[6]

The principal charges in *Steinberg* centered about the Registration Statement and Prospectus for the Trust's April 13, 1972 offering of 2,600,000 units which were sold to the public for a total of approximately $65,000,000. Twenty-five dollars was the purchase price for each unit, which consisted of one share of beneficial interest and one warrant to purchase one share at a price of $25. The net proceeds of the offering were to be invested in apartment buildings, shopping centers and office buildings and in short- and intermediate-term construction, development and land mortgage loans. Pending such investments, the proceeds were to be temporarily invested in government debt securities, mortgage-backed securities guaranteed by the Government National Mortgage Association ("GNMA") and certificates of deposit.

The complaint alleged that the Registration Statement and Prospectus were materially false and misleading in that they failed to disclose, inter alia: (1) that the Board of Trustees was a "sham," dominated by Trustees who were affiliated with entities related to the Trust, that is, City Investing Company ("C.I."), which allegedly controlled the Trust, and C.I.'s indirectly wholly-owned co-defendant, C.I. Planning Corp. ("Planning"), the Trust's investment advisor; (2) that the Trust's initial investment in a group of garden apartment complexes referred to as the "Multicon" apartments was made without independent appraisals or adequate on-site inspections, which inspections would have revealed that the apartments had an excessive turn-over rate, were poorly managed and required substantial capital expenditures in order to be maintained in competitive condition; (3) that certain risks were inherent in leverage financing, in construction, development and second mortgage loan investments, and in holding GNMA securities; and (4) that the relationship between C.I. and Planning and the extent of benefits inuring to them under the Advisory Agreement between Planning and the Trust would produce conflicts of interest with the Trust.

1. 15 U.S.C. § 78j(b).

2. 17 C.F.R. § 240.10b–5.

3. 15 U.S.C. §§ 77*l*, 77q.

4. *Id.* §§ 78j(b), 78m(a), 78n(a).

5. The dismissal of the derivative claims was affirmed on appeal, 556 F.2d 557 (2d Cir. 1976), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977). Subsequently on January 31, 1978, Mason instituted another individual and derivative action in the Eastern District of Pennsylvania, alleging violations of the securities laws in connection with the proxy statements and solicitations of the Trust from its inception to and including August 19, 1977. *C. I. Realty Investors v. Huang,* No. 78–343 (E.D. Pa.) *(Mason II).* *Mason II,* which was stayed by this Court pending the outcome in *Steinberg,* is the subject of a separate settlement proposal which was approved by Judge Van Artsdalen on March 19, 1979.

6. The *Mason* suit was certified as a class action for purposes of the settlement on October 16, 1978.

The *Mason* complaint largely repeated the above allegations but expanded the class to encompass all purchasers up to and including February 1, 1975 because the charged misstatements and omissions allegedly continued, and were not corrected, in reports filed with the Securities and Exchange Commission and the New York Stock Exchange and in statements accompanying proxy solicitations during that period. The impetus for both suits was the decline in the market value of the Trust's shares from $25 per share on April 13, 1972 to approximately $2 per share on December 31, 1974.

The defendants in each action included the Trust, its individual Trustees, Planning, C.I. and two of the managing underwriters for the public offering. The *Mason* litigation also included the Trust's certified public accountant, Peat, Marwick, Mitchell & Co., as a defendant. All defendants denied and continue to deny the charges levelled against them by plaintiffs.

The proposed settlement was reached after prolonged arms-length negotiations, following extensive and complete discovery by the contending parties, including voluminous interrogatories and document production and depositions of more than· sixty witnesses. This case was ripe for trial and the parties were on seventy-two hours notice to proceed when agreement was finally achieved. In substance, the settlement provides for a Class Settlement Fund of $925,000, consisting of $466,-667 contributed by the defendants other than the Trust, and $458,333 contributed by the Trust.[7] From the Fund will be deducted the costs and expenses incurred in giving notice to the respective classes of the proposed settlement; ‚the fees, costs and expenses of administration of the Fund; and attorneys' fees and disbursements in such amounts as are allowed by the Court. The net sum will be distributed to members of the class who have not requested exclusion and whose claims are allowed. There is no provision for refund to the defendants of unclaimed amounts; rather, unclaimed portions will be distributed pro rata to claiming class members.

The function of the Court in reviewing this application, "is not 'to reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement,' nor is the court called upon to substitute its business judgment for that of the parties who worked out the settlement. Rather, in substance, it is called upon to evaluate the probabilities of success upon a trial and to compare the benefits thereof with the terms of the compromise."[8]

As to the first factor, the probability of success, a number of developments in the law and in the marketplace subsequent to the filing of the complaints herein present substantial obstacles to a successful prosecution of the action. In addition to the normal trial risks associated with complex securities cases, the *Steinberg* action, which was premised on section 10(b) of the Exchange Act, is further encumbered by the problem of proving scienter. The Supreme Court's decision in *Ernst & Ernst v. Hochfelder,*[9] requiring proof of intent to deceive, manipulate or defraud, was handed down almost two years after the complaint was filed. Fully aware of the liberality accorded requests to amend pleadings, this Court nonetheless denied plaintiffs' motion to add

---

7. The Trust's contribution will be drawn from the "Derivative Fund" set up by the *Mason II* settlement agreement, *see* note 5 *supra*. That agreement provides for a $100,000 contribution by the defendants and for the purchase by Planning of 62,609 shares of the Trust for $1,048,700. The purchase price is equal to the book value of the shares at February 28, 1978 ($16.75).

8. *Blank v. Talley Indus., Inc.,* 64 F.R.D. 125, 129 (S.D.N.Y.1974) (quoting *Levin v. Mississippi River Corp.,* 59 F.R.D. 353, 361 (S.D.N.Y.), aff'd on opinion below sub nom. Wesson v. Mississippi River Corp., 486 F.2d 1398 (2d Cir.), *cert. denied,* 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973)); *accord, City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462–63 (2d Cir. 1974); *Newman v. Stein,* 464 F.2d 689, 691–92 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *Voege v. Ackerman,* 67 F.R.D. 432, 435–36 (S.D.N.Y.1975).

9. 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

claims under sections 11 and 12(2) of the Securities Act,[10] made on the eve of the termination date of all discovery, in light of the substantial prejudice to defendants.[11] Subsequently, a motion for summary judgment was made on behalf of the "outside" trustees, those who had no other relationship to the Trust or its related companies. Although this Court applied the standard of recklessness which had prevailed in this Circuit prior to *Hochfelder*,[12] it nonetheless granted the motion in favor of three of the trustees on the ground that plaintiffs had failed to adduce any fact or circumstance that would warrant "the inference that the outside trustees, . . . acted with reckless indifference to or in callous disregard of their duties as such trustees." [13]

As to plaintiffs' claim with regard to the Multicon garden apartment complexes,

which counsel admits was a major part of plaintiffs' case, the exhaustive discovery produced evidence of only questionable probative value—for example, the allegedly high turnover rate could be interpreted in negative terms as having a destabilizing effect on the apartment community, or in positive terms as enabling the owners to raise the rent more frequently and generate higher profits. Further, on this motion defendants have shown that of the twenty-five properties purchased, fourteen were sold in 1976 at a profit to the Trust of $2,496,423 and no write-down of the remainder of the properties on the company's books has been required.

As to the allegations concerning certain risk factors and potential conflicts of interest, plaintiffs concede that some disclosure was made.[14] They therefore faced the more

---

**10.** 15 U.S.C. §§ 77k, 77*l*(2).

**11.** Two original trustees in office at the time suit was filed had died; two others had retired and were without notes or other data relevant to the defense of due diligence; despite extraordinary efforts, the files of the underwriters touching upon the matters involved had not been located; and other material witnesses were unavailable.

**12.** *See, e. g., Lowenschuss v. Kane*, 520 F.2d 255, 268 n.10 (2d Cir. 1975); *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363–64, 396–99 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973) (en banc).

**13.** *Steinberg v. Carey*, 439 F.Supp. 1233, 1241 (S.D.N.Y.1977). The motion was denied in the instance of the fourth trustee because of the depth of his admitted participation in the preparation for the offering.

On the issue of the defendants' state of mind, the *Mason* complaint, with its claims under §§ 12(2) and 17(a) of the Securities Act, stands in a slightly better posture. But these sections pose their own problems. For example, although negligence would suffice to establish liability under § 12(2), the short statute of limitations for actions under that section, *see* 15 U.S.C. § 77m; *Cook v. Avien, Inc.*, 573 F.2d 685, 694–98 (1st Cir. 1978); *Brick v. Dominion Mortg. & Realty Trust*, 442 F.Supp. 283, 289–92 (S.D.N.Y.1977), and the requirement of privity, *see Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969); *Demarco v. Edens*, 390 F.2d 836 (2d Cir. 1968); *Brick v. Dominion Mortg. & Realty Trust*, 442 F.Supp. at 292; R. Jennings

& H. Marsh, Securities Regulation 840–41 (4th ed. 1977), present substantial obstacles to recovery for many members of the proposed class.

As to the § 17(a) claim, although our Court of Appeals has intimated that a negligence standard would apply, *see SEC v. Coven*, 581 F.2d 1020 (2d Cir. 1978), *petition for cert. filed*, —— U.S. ——, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1978); *SEC v. Aaron*, No. 77-6091, (2d Cir. Mar. 12, 1979), it only recently definitively held that a private right of action exists under that section, *compare Kirshner v. United States*, No. 77 6104, (2d Cir. Nov. 30, 1978) *with SEC v. Coven*, 581 F.2d at 1027 n. 15. Finally, because of the stay imposed by this Court, the *Mason* litigants are required to await the outcome of an estimated eight-week trial in *Steinberg* before litigating the same factual allegations under the Securities Act standard.

**14.** For example, plaintiffs contended in the pretrial order that defendants had failed to disclose that "leveraging could result in a substantial reduction in yield or in a loss during times of increasing interest rates." The first page of the Prospectus, however, in bold face type warned that the securities were subject to certain risk factors and directed the reader to the section entitled "Risk Factors" wherein it was stated: "The Trust will seek to increase the yield on investments by leveraging. Such borrowings increase commensurately the Trust's risk of loss because they represent a prior claim on the Trust's assets and require fixed payments of interest and amortization of principal regardless of profitability."

Possible conflicts of interest between the Trust and its investment advisor, Planning,

formidable task of convincing a jury that the additional disclosure they urged, in light of the total mix of information already available, was material, rather than "excessively detailed or cumulative," [15] and that defendants' contrary determination was intentionally or recklessly misleading. Plaintiffs are aware of further obstacles to a successful result upon a trial since there is no direct evidence to support their charges and perforce they would be compelled to rely upon inferences to be drawn from circumstantial evidence which might not be readily accepted by a jury.

Finally, plaintiffs' difficulties are compounded by the requirement of proof of damages and the attendant issue of the appropriate measure thereof, even were they to prevail on the merits. "Two theories of damages for defrauded buyers have been used in this circuit: out-of-pocket losses and the difference between purchase price and subsequent resale price." [16] The

former measure is the usual one, representing the difference between the price paid and the true value of the shares received.[17] The latter measure, referred to alternatively as "gross economic loss" or "rescission damages," [18] is the one plaintiffs have consistently urged.[19] Admitting that the application of this measure has largely been confined to broker-fraud cases,[20] in which the plaintiffs have established by direct testimony that they would not have purchased the securities at all had the full facts been known, plaintiffs here indicate that they would have depended on expert testimony to prove that a reasonable person would not have purchased the Trust's shares if full disclosure had been made. There is the initial risk, of course, that such testimony may not be accepted. Moreover, it is far from clear that expert testimony as to what a reasonable investor would have done is sufficient to justify transplanting the rescission measure from its present context of

were similarly highlighted on the first page. Disclosure of the basis for computing Planning's advisory fee was made in the body of the Prospectus and coupled with the statement that "the investment of borrowed funds by the Trust would increase the compensation payable to the Advisor."

15. *Richland v. Crandall,* 262 F.Supp. 538, 553 (S.D.N.Y.1967); *see TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 602–05 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Bonime v. Doyle,* 416 F.Supp. 1372, 1377 (S.D.N.Y.1976), *aff'd mem.,* 556 F.2d 554 (2d Cir. 1977); *Spielman v. General Host Corp.,* 402 F.Supp. 190, 206 (S.D.N.Y.1975), *aff'd,* 538 F.2d 39 (2d Cir. 1976); *Shvetz v. Industrial Rayon Corp.,* 212 F.Supp. 308, 310 (S.D.N.Y. 1960).

16. *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 603 (2d Cir. 1978).

17. *Fershtman v. Schechtman,* 450 F.2d 1357, 1361 (2d Cir. 1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir. 1971); *McLean v. Alexander,* 449 F.Supp. 1251, 1268 (D.Del.1978); *Bonime v. Doyle,* 416 F.Supp. 1372, 1384 (S.D.N.Y.1976), *aff'd mem.,* 556 F.2d 554 (2d Cir. 1977); Restatement of Torts (Second) § 549, Comment b.

18. *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 604 (2d Cir. 1978); *Rolf v. Blyth,*

*Eastman Dillon & Co.,* 570 F.2d 38, 49 & n.21 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

19. Plaintiffs apparently urge the rescission measure because the alternative out-of-pocket rule fixes the true value of the shares either at the date of purchase or at a subsequent date when the fraud has or should have been discovered. Thus a shareholder selling after that date would be unable to recover damages for any further decline in the value of his shares. Further, under the out-of-pocket measure an appropriate offset to eliminate losses attributable to causes other than the alleged misrepresentation, for example general market decline, would be necessary. *Cf. Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (offsetting gross economic loss by percentage reflecting general decline). If plaintiffs could prove, however, that they would never have purchased the shares if the truth had been known, then defendants would not be "permitted to avoid making [plaintiffs] whole merely because upon discovery of the fraud [they] happened to sell the securities on a declining market." *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 604 (2d Cir. 1978).

20. *Clark v. John Lamula Investors, Inc.,* 583 F.2d 594 (2d Cir. 1978); *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1970); *Barthe v. Rizzo,* 384 F.Supp. 1063 (S.D.N.Y.1974).

individual face-to-face transactions to the class action setting.[21] It is certainly questionable that every class member would have refrained from purchasing at *any* price rather than from purchasing at an inflated price.

Additional problems are presented by the alternative measure, that is, recovery of "out-of-pocket" losses. In determining the "true value" of the shares received, federal courts have identified two dates: the date of the purchase and the date when the fraud was or should have been discovered.[22] Defendants urge the former and contend that since the Trust had not begun active operations at the time of the 1972 public offering, "the shareholders . . . were investing in a pool of assets consisting of real properties, mortgages and temporary investments. The value of these assets was increased when combined in an organizational structure that permitted relatively small investors to acquire an interest in these assets. Under these circumstances, the value of the Trust's securities was what plaintiffs paid for them." [23]

The rationale for looking instead at trading prices shortly after public discovery of the seller's fraud is that prior to that time the market has been artificially inflated by the misrepresentations. Although the trad-

ing prices for the Trust's shares began to decline within the year following the offering, the substantial drop in value that precipitated this suit did not occur until 1974 and 1975. Plaintiffs have made no attempt to identify a point in time when the misrepresentations they allege were or should have been publicly discovered. Moreover, it is likely, as defendants contend, that the post-offering decline in trading price is not indicative of the true value of the Trust's shares uninflated by alleged misrepresentations, but rather reflects the general decline in the REIT industry. On this point, they offer the NAREIT Stock Price Indices and S&P REIT Indices for the relevant time period to show that the decline in market price of the Trust's shares followed a general decline in the REIT market and that the present price for the Trust's shares, which is only slightly less than the original offering price, far exceeds the relevant market indices. If plaintiffs' recovery were offset to eliminate losses not caused by the alleged violation,[24] then the real possibility is raised, as counsel concedes, "that even after any finding of liability, plaintiffs and the class would recover no damages." [25] "When all these dubieties are considered in combination, as they must be," [26] the obstacles to a substantial recovery are formidable. In-

**21.** *Compare Bonime v. Doyle,* 416 F.Supp. 1372, 1384–86 (S.D.N.Y.1976), *aff'd mem.,* 556 F.2d 554 (2d Cir. 1977) (class action; out-of-pocket rule) *and Tucker v. Arthur Andersen & Co.,* 67 F.R.D. 468, 482 (S.D.N.Y.1975) (semble) *with Reeder v. Mastercraft Elecs. Corp.,* 363 F.Supp. 574, 582 (S.D.N.Y.1973) (multiple plaintiffs; rescission measure). *See generally* ALI, Federal Securities Code § 1708(c) (Proposed Off. Draft 1978).

**22.** *Compare Occidental Life Ins. Co. v. Pat Ryan & Assocs.,* 496 F.2d 1255, 1264–65 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974) *and Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965) *with Harris v. American Investment Co.,* 523 F.2d 220, 225 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976) *and Esplin v. Hirschi,* 402 F.2d 94, 104–05 (10th Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969) *and Tucker v. Andersen & Co.,* 67 F.R.D. 468, 482 (S.D.N.Y. 1975). *See generally* ALI, Federal Securities Code §§ 1703(h)(1), 1708(c) (Proposed Off.

Draft 1978); Restatement of Torts (Second) § 549, Comment c.

**23.** Defendants' Joint Pre-Trial Memorandum at 118.

**24.** *See Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Bonime v. Doyle,* 416 F.Supp. 1372 (S.D.N.Y.1976), *aff'd mem.,* 556 F.2d 554 (2d Cir. 1977); ALI, Federal Securities Code § 1708(b)(2) (Proposed Off. Draft 1978).

**25.** Affidavit of Richard D. Greenfield at 37; *see Harris v. American Investment Co.,* 523 F.2d 220, 225 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976) (quoting Restatement of Torts § 549, Comment b, at 110 (1938)).

**26.** *Newman v. Stein,* 464 F.2d 689, 698 (2d Cir.) (Friendly, J.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

deed, analysis of the difficult problems which confront plaintiffs in establishing both their claim and damages suggests that the settlement offered by defendants is not acknowledgment of the force of plaintiffs' claims, but rather payment for their peace at a modest cost in order to avoid heavy trial expenses in addition to the vast expenses already incurred in the pretrial period.

Given the substantial litigation risks, the projected eight-week trial, and counsel's own estimate of the evidence as it has developed as equivocal and complex, this Court cannot say that the probabilities of success outweigh the benefits of the offered compromise. The notice of the proposed settlement indicated that if all entitled to participate filed claims which were allowed, the potential recovery would be approximately $.26 per share. As of the end of the filing period, claims representing 851,000 shares and 307,000 warrants had been filed and allowed, representing a recovery of approximately $.70 per share and $.052 per warrant, assuming the full amount requested by counsel for fees and disbursements were allowed. No class member has offered any objection to the settlement, and seasoned and experienced counsel, who have vigorously and extensively engaged in pretrial discovery, have placed their imprimatur on its terms. In view of all the foregoing, this Court is satisfied that the terms of the settlement are fair and reasonable, and accordingly it is approved.

 We next consider the application by the plaintiffs' attorneys for fees for services rendered and for reimbursement of expenses incurred on behalf of the *Steinberg* and *Mason* classes.[27] Counsel have submitted an extensive affidavit in support of their request for $325,000 in fees and $47,-

693.14 in disbursements, for a total of $372,-693.14. As noted above, if allowed in full, the recovery for those members of the class who filed allowable claims would be approximately $.70 per share and $.052 per warrant. Counsel estimate that the average loss sustained by an investor is $15.92 per share and $1.22 per warrant. Thus assuming the estimated loss as asserted by plaintiffs' attorneys is correct, the actual recovery to those entitled to damages, though within the range of reasonableness, is rather minimal.

Bearing in mind this factor, among other factors to be evaluated, we reach the issue of what is fair and reasonable compensation to the attorneys. The guidelines that give direction to this question have been set forth in the oft-cited case of *City of Detroit v. Grinnell Corp.*,[28] and need not be repeated here. So, too, it is unnecessary to marshal the holdings in various cases stressed by counsel which emphasize the important "private attorney general" role played by attorneys in securities fraud and antitrust suits and the view that allowances for such services should be generous.[29] It is important to note what is sometimes forgotten—that these actions are presumably intended for the benefit of the small consumer or investor who otherwise would have no means of redress. And as this Court has observed previously: "Our own Court of Appeals, acknowledging the policy of liberal application of [Rule 23], nonetheless cautioned against permitting 'actions to proceed where they are not likely to benefit anyone but the lawyers who bring them.' "[30] Recognizing that an award of fees in a matter of this type must fairly compensate the attorney for his services, our Court of Appeals has also suggested it should be " 'made with moderation and a

---

27. The attorneys have filed a separate application for fees and disbursements in *Mason II*, the derivative action in the Eastern District of Pennsylvania. There they request an allowance of $93,000 in fees and reimbursement of $10,609 in expenses.

28. 495 F.2d 448 (2d Cir. 1974).

29. *Bleznak v. C.G.S. Scientific Corp.*, 387 F.Supp. 1184, 1189 (E.D.Pa.1974); *Rosenfeld v. Black*, 56 F.R.D. 604, 605 (S.D.N.Y.1972); *Dolgow v. Anderson*, 43 F.R.D. 472, 494 (E.D.N.Y. 1968).

30. *Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.*, 55 F.R.D. 26, 30 (S.D.N.Y.1972) (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 567 (2d Cir. 1968)).

jealous regard to the rights of those interested in the fund.' "[31]

Here the attorneys show the number of hours logged by partners, associates and outside counsel[32] and allege a total of 4,619.50 hours. At the attorneys' billing rates for non-contingent matters, this would amount to $514,723.50, but perhaps realistically recognizing that the amount of fees must bear a reasonable relationship to actual recovery, they request, as already noted, $325,000.

The *Grinnell* factors, while giving direction to matters to be considered, do not mandate their mechanical application. While the time factor is a jumping-off point, it is only of relative importance; otherwise, incompetence or inefficiency may be rewarded and effectiveness and experience penalized.[33] The time factor must bear a reasonable relationship to what is required effectively and efficiently to further the claims asserted and here the Court is justified in relying on its own experience as well as its knowledge of events in the particular case in making that determination.[34]

The fact is that this litigation was in a somewhat quiescent state until it was assigned to this Court, following which terminal dates were set for completion of the discovery process by all parties. This brought about a flurry of activity, much of which should have been undertaken previously and not all of which was reasonably required in the protection of the plaintiffs' interests.[35] In short, this Court is satisfied

that excess time was charged for services not necessarily required and which were due to the languorous pace at which the case had been moving. In fairness to the attorneys who now seek compensation, it is noted that they were substituted for the original attorneys of record and under the pressure of terminal dates aggressively proceeded to prepare the case for trial. But be that as it may, the clients should be charged fees only for services necessarily required. Although there is no precise, slide-rule method of determining what this Court deems an excess of hours, an empirical approach is justified. The Court is satisfied that competent, effective and efficient representation of the class and the furtherance of its claims could have been readily achieved in not more than two-thirds of the time claimed.

As with the time factor, an attorney's claimed billing rate, though lending a degree of objectivity to a fee award, is not controlling. Counsel here charged a flat rate for all hours of service by each individual with no specific breakdown of the time spent on particular matters nor indication of the nature of his services, whether substantial, unusual, routine or administrative. Courts in this Circuit and others have long admonished that lower rates should be charged for relatively administrative or non-legal work than for matters requiring a higher degree of professional skill.[36] Similarly, time spent in travelling to and from conferences, court appearances and deposi-

**31.** *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir. 1974) (quoting *Trustees v. Greenough,* 105 U.S. 527, 536, 26 L.Ed. 1157 (1881)).

**32.** Counsel faced the admittedly difficult task of separating class action from derivative action services. *Compare Barnett v. Pritzker,* 73 F.R.D. 430, 432 (S.D.N.Y.1977).

**33.** *Blank v. Talley Indus., Inc.,* 390 F.Supp. 1, 5 (S.D.N.Y.1975); *see Prandini v. National Tea Co.,* 557 F.2d 1015, 1020 (3d Cir. 1977).

**34.** *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974); *Davis v. Reed,* 72 F.R.D. 644, 646 n.2 (N.D.Miss.1976).

**35.** In the numerous appearances before this Court, plaintiffs were ofttimes represented by two attorneys when one would clearly have sufficed. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974).

**36.** *Prandini v. National Tea Co.,* 557 F.2d 1015, 1019–20 (3d Cir. 1977); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 473 (2d Cir. 1974); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974); *Kane v. Martin Paint Stores,* 439 F.Supp. 1054, 1055–56 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1368 (2d Cir. 1978); *Barnett v. Pritzker,* 73 F.R.D. 430, 433 (S.D.N.Y.1977).

tions should not be billed at the higher rate.[37]

Taking into account all factors, such as time, contingency of payment of fees, the nature and complexity of the issues, standing of counsel and other relevant matters, the Court grants fees in the sum of $250,-000. The request for reimbursement of expenses is allowed in the sum of $45,000. This figure reflects a reduction in the claim for law clerk and paralegal wages. Although the hourly rate for these paraprofessional services appears to be reasonable, the number of hours claimed—approximately 1,090 hours for four clerks as compared with 4,619.50 hours for fourteen attorneys—is excessive.[38]

Submit order accordingly.

---

**37.** *Neely v. City of Grenada,* 77 F.R.D. 484 (N.D.Miss.1978); *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1056 n.2 (S.D.N.Y.1977), aff'd, 578 F.2d 1368 (2d Cir. 1978); *Davis v. Reed,* 72 F.R.D. 644, 647 (N.D.Miss.1976).

**38.** *Neely v. City of Grenada,* 77 F.R.D. 484, 487 (N.D.Miss.1978).