**Julia B. LEVENSON, Plaintiff,**

v.

**OVERSEAS SHIPHOLDING GROUP, INC., Maritime Overseas Corporation, Raphael Recanati, Morton P. Hyman, Morris Feder, Milton R. Kliger, Michel Fribourg, Frank C. Hess, Ran Hettena, Hermann Merkin, Stephen Shalom, George M. Shapiro and James Stewart, Defendants.**

**76 Civ. 1130 (RWS).**

United States District Court, S. D. New York.

Nov. 14, 1979.

---

Leonard I. Schreiber, New York City,
Pincus, Munzer, Bizar & D'Alessandro, New
York City, for plaintiff.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for individual defendants; Jacob Imberman, New York City, of counsel.

Corbin & Gordon, New York City, for Overseas Shipholding Group, Inc.

Burke & Parsons, New York City, for Maritime Overseas Corp.

## OPINION

SWEET, District Judge.

The parties to this shareholder's derivative suit have moved, pursuant to Rule 23.1, Fed.R.Civ.P., and Rule 11B of the Local Rules of the Southern District of New York, for approval of a proposed settlement, allowance of attorney's fees to counsel for plaintiff and reimbursement of expenses.

Plaintiff Julia B. Levenson ("Levenson"), a shareholder of Overseas Shipholding Group, Inc. ("OSG") since prior to January 1, 1972, commenced this action on behalf of OSG against Maritime Overseas Corporation ("MOC"), and individual defendants who have served as directors of OSG. Levenson challenges certain actions by OSG and MOC which she claims have unfairly benefitted OSG's insiders at the expense of OSG.

Defendant OSG is a Delaware corporation with its principal place of business in New York. OSG was formed in 1969, and its stock is publicly traded on the New York Stock Exchange. Its principal business is the chartering of a fleet of tankers and bulk freight ships.

Defendant MOC is a privately-held New York corporation. Pursuant to contract, MOC has at all pertinent times acted as OSG's exclusive agent for the management and operation of OSG ships. Under other contracts, MOC also served as OSG's exclusive chartering broker and as exclusive broker for the purchase, sale and construction of OSG vessels. MOC performs similar services for other shipping companies.

The other defendants in this action are twelve individuals who have served as directors of OSG. Plaintiff alleges that seven of these individuals, defendants Recanati, Feder, Kliger, Fribourg, Hettena, Merkin and Shalom (the "Control Group"), have owned, at relevant times, a substantial portion of the outstanding shares of OSG and have acted in concert to control its policies. In addition, defendants Recanati, Feder, Kliger, Hettena, Merkin and Shalom are alleged to have owned or controlled all of the capital stock of MOC until October, 1974, when defendant Hettena became MOC's sole shareholder.

Levenson's amended complaint asserts six causes of action. The first cause of action alleges that the compensation paid by OSG to MOC under its service, agency and management agreements has been excessive, and that the individual defendants knowingly acquiesced in the payment of such exorbitant compensation in breach of their fiduciary duty to OSG and its minority shareholders.

Plaintiff's second cause of action asserts that in August, 1973, the Control Group caused OSG to enter into an agreement with MOC purporting to limit the aggregate compensation paid by OSG for services performed by MOC (the "Agreement"). The Agreement restricted MOC's consolidated net income after taxes from all shipping operations to $150,000 for the year ending December 31, 1973, and allowed this maximum to increase by ten percent in each succeeding year. Amounts earned in excess of this maximum were to be refunded to OSG. Plaintiff alleges that in order to limit such refunds, the Control Group inflated MOC's expenses by causing MOC to pay unreasonable compensation to certain individual defendants, thereby reducing MOC's consolidated net income. Plaintiff claims that MOC also reduced its consolidated net income by charging other companies, in which certain individual defendants held an interest, lower fees than were charged to OSC for the same services. As a consequence, Levenson claims that MOC's refunds to OSG in accordance with the Agreement were substantially reduced, causing injury to OSG and to its minority shareholders.

The third cause of action alleges that the individual defendants caused OSG to pay unreasonably high salaries and to issue an excessive number of stock options to certain individual defendants. The fourth claim avers that the individual defendants prevented OSG from exercising its right of first refusal to purchase equity interests in MOC when those interests were sold to Hettena in 1974, allegedly in order to perpetuate the Control Group's claimed capacity to divert funds from OSG through MOC. Levenson's fifth claim asserts that the individual defendants diverted business from OSG to other companies in which they held an interest in breach of this fiduciary duty to OSG. The sixth cause of action alleges that the individual defendants caused OSG to file with the Securities and Exchange Commission ("SEC") and to distribute to its shareholders proxy statements for each of the years 1971 to date which were materially false and misleading in violation of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9 of the SEC rules and regulations adopted thereunder, 17 C.F.R. § 240.14a–9.

The parties began negotiating a settlement to this suit in January, 1979 and submitted a proposed stipulation of settlement to this court on April 3, 1979. Timely notice was sent to all shareholders of OSG explaining the nature of this litigation, the terms of the proposed settlement and the right of the shareholder to contest the settlement. A hearing was held on June 8, 1979 to review the terms of the proposed settlement and to hear any objections to its approval. No objections were filed by any shareholder of OSG.

■ The policy in this circuit strongly favors out-of-court resolution of legal controversies. *See Republic National Life Insurance Co. v. Beasley,* 73 F.R.D. 658 (S.D. N.Y.1977). A proposed settlement should be approved if it results from noncollusive negotiations following substantial discovery

and if the settlement is fair, reasonable and adequate. *City of Detroit v. Grinnell Corporation,* 495 F.2d 448 (2d Cir. 1974); *Blank v. Talley Industries, Inc.,* 64 F.R.D. 125 (S.D.N.Y.1974).

■ Prior to the proposed settlement, plaintiff conducted extensive discovery of MOC, OSG and the individual defendants. The investigation entailed production of over fifteen thousand pages of documents, the taking of depositions of defendants Hettena, Recanati, Hyman, Feder and Kliger, and the answering of two sets of interrogatories. The court is satisfied that the proposed settlement was reached following strongly contested arm's length bargaining among the parties, based on an intelligent evaluation by the parties of their respective positions.

■ The most important factor in determining whether a proposed settlement is fair and reasonable is a weighing of the probability of success against the benefits of the compromise. *Steinberg v. Carey,* 470 F.Supp. 471, 474 (S.D.N.Y.1979); *Lewis v. Anderson,* 81 F.R.D. 436, 438 (S.D.N.Y. 1978). In performing this task, however, a court should not attempt to resolve all disputed issues, but should simply evaluate the relative strengths of plaintiff's claims. *Newman v. Stein,* 464 F.2d 689, 692 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *Stull v. Baker,* 410 F.Supp. 1326, 1333 (S.D.N.Y.1976). The evidence uncovered by the comprehensive investigation conducted by Levenson to date indicates that her chances for recovery on the merits are speculative.

■ The first cause of action, alleging excessive fees paid to MOC by OSG, states a valid claim, since transactions between a corporation and a second corporation controlled by directors of the first are subject to rigorous scrutiny.[1] *Johnston v. Greene,* 35 Del.Ch. 479, 121 A.2d 919 (Del.Supr.

---

1. However, section 144 of the Delaware Gen. Corp. Law and section 713 of the New York Business Corporation Law specifically authorize a corporation to contract with a second organization in which its directors have an interest so long as the directors disclose their interest to the board of directors and the terms of the contract are fair to the corporation at the time the contract is approved. *Fliegler v. Lawrence,* 361 A.2d 218 (Del.Supr.1976).

1956); *Kutik v. Taylor,* 80 Misc.2d 839, 364 N.Y.S.2d 387 (1975). *See also Singer v. Magnavox Co.,* 380 A.2d 969 (Del.Supr.1977) (discussing fiduciary duties of directors to minority shareholders). However, the courts have been reluctant to challenge the appropriateness of management fees paid to a second corporation. *See Saxe v. Brady,* 40 Del.Ch. 474, 184 A.2d 602, 610 (Del.Ch. 1962). *See also Muschel v. Western Union Corp.,* 310 A.2d 904 (Del.Ch.1973) (similar rule in evaluating terms of merger). Therefore, Levenson faces difficult problems of proof in establishing liability under her first claim. Moreover, even if liability were determined, Levenson would confront the difficult task of proving that the fees paid to MOC caused damage to OSG.

Similarly the evidence tending to prove that MOC padded its expenses by overcompensating the individual defendants, or that MOC undercharged other corporations in order to reduce revenues, provides a thin factual predicate for an ultimate finding of liability against any of the defendants on the second claim.

The third cause of action, alleging that defendants Feder, Kliger and Hettena were overcompensated both in cash and stock options, also states a valid claim. *See* N.Y. Bus.Corp.Law § 720(a)(1)(B); *Cohen v. Ayers,* 449 F.Supp. 298 (N.D.Ill.1978); *Michelson v. Duncan,* 386 A.2d 1144 (Del.Ch.1978). Nevertheless, the evidence of exorbitant compensation by OSG or of gifts of stock options is also thin. Although there is an issue as to whether options issued to defendant Hettena were properly exercised, plaintiff acknowledges that the chances of prevailing on this point are dubious.

Plaintiff's fourth claim is that the individual defendants wrongfully prevented OSG from exercising a contractual right of first refusal of an equity share in MOC when such share was sold to Recanati in 1974. Plaintiff contends that OSG was not properly notified of this sale. The alleged purpose of preventing OSG from gaining control over MOC was to maintain MOC as a funnel for looting OSG. However, Levenson has adduced evidence which would indicate that OSG was notified of the proposed sale to Recanati and stated no objection. In the absence of proof of fraud or bad faith, the decision not to purchase an equity interest in MOC is left to the sound business judgment of OSG's directors. *Gimbel v. Signal Cos., Inc.,* 316 A.2d 599 (Del.Ch.), *aff'd,* 316 A.2d 619 (Del.Supr.1974); *Kaplan v. Goldsamt,* 380 A.2d 556 (Del.Ch.1977); *Greenbaum v. American Metal Climax, Inc.,* 27 A.D.2d 225, 278 N.Y.S.2d 123 (1st Dept. 1967); *Kamin v. American Express,* 86 Misc.2d 809, 383 N.Y.S.2d 807 (1976). Thus Levenson would encounter significant difficulties in proving this fourth cause of action.

Levenson has similarly acknowledged that discovery to date has disclosed no factual basis whatsoever to support the allegations of the fifth cause of action, charging diversion of business from OSG to other companies in which the individual defendants hold an interest.

Levenson's sixth claim alleges that the individual defendants failed to disclose material facts to the shareholders of OSG in proxy statements, thus violating Section 14(a) of the Securities Exchange Act. The material omissions and misstatements complained of are the wrongdoings and breaches of trust alleged in the other five causes of action. In view of the slight evidence adduced of any such wrongdoing by the defendants, the plaintiff faces serious difficulties in prosecuting this claim successfully. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The settlement proposed by the parties offers a substantial benefit to the shareholders of OSG. It calls for an amendment of the Agreement limiting compensation from OSG to MOC. The Agreement will be extended from 1983 to 1988, thereby revoking MOC's right to cancel the Agreement in 1983. The settlement also freezes the maximum compensation payable under the Agreement at the 1978 level for three years; rather than increasing each year by ten percent as under the current terms of the Agreement, the 1978 ceiling of $241,577

will remain in effect for 1979, 1980 and 1981. Thereafter, the maximum figure will again increase at ten percent each year. A comparison of the maximum figures for the years 1979 to 1988 under the current and proposed terms of the Agreement and the potential savings from the settlement are presented in Appendix A.

The parties have disputed the actual value of this settlement to OSG. The lower maximum payments will result in a savings to OSG only if MOC's post-tax net income exceeds the lower limits established by the settlement. If MOC's net income is less than the new maximum for a given year, OSG will receive no refund, even though the new maximum is lower than the maximum currently set by the Agreement. In order to reap the full benefit of the settlement, MOC must earn an amount of post-tax net income greater than the old limit contained in the Agreement for each of the years 1979–1988.

A determination of the value of the settlement to OSG thus turns on projection of the net income of MOC for the next ten years. The parties have suggested alternative approaches. According to Levenson, MOC's net income will continue to grow at approximately the rate of growth experienced from 1973 to 1978, that is around 4%. If this proves to be the case, then MOC's consolidated net income for each of the next ten years will exceed the compensation limits formerly specified in the Agreement, yielding OSG maximum benefit from the settlement. The aggregate savings to OSG over the next ten years, discounted to present value at a rate of nine percent,[2] and expressed in pre-tax dollars, would then be $1,166,287.

According to defendants MOC's net income will remain relatively constant over the next ten years at a level determined by averaging the net income of MOC over the past three years.[3] If this level is maintained, then the benefit to OSG will be less than the maximum predicted by Levenson. In particular, if MOC's post-tax net income remains constant for ten years at $457,287, the average for the past three years, the aggregate benefit to OSG in pre-tax dollars discounted to present value at nine percent would be $851,686.

In view of the general upward trend of MOC's income over the past six years, the prediction of a constant MOC income over the next ten years appears excessively pessimistic. On the other hand, plaintiff's suggestion that MOC's income will exceed the net income limits under the current Agreement for each of the next ten years seems overly optimistic. In light of MOC's past income fluctuations,[4] the probable benefit to OSG is somewhere between the figure of $1,166,287 suggested by plaintiff and the figure of $851,686 indicated by defendants. The likely value of the settlement to OSG is approximately $1,000,000.

The settlement does not call for current payment of assets by defendants; any benefit to OSG must be recovered, if at all, based on MOC's earning experience over the next ten years. Nevertheless, considering all the circumstances of this case—the extensive discovery pursued to date, the difficulty of any recovery by Levenson, the complexity of the issues presented, the lack

2. Levenson has urged that seven percent is a more appropriate discount rate, in which case the benefit to OSG would be $1,304,841. In view of the current interest and inflation rates and the risk that these benefits will not accrue at all, the court finds that nine percent is a more appropriate rate for estimating the expected benefits of the settlement to OSG.

3. Defendants have also made calculations using a four-year average of $409,307 or a six-year average of $366,746. If MOC maintained those levels of income for ten years, the aggregate benefit to OSG would be only $719,287 or $558,427 respectively. This projection appears overly pessimistic, particularly in view of MOC's post-tax net income of $712,238 and $511,019 in the past two years.

4. MOC's net income before tax and before refund to OSG under the Agreement for the years 1973–1978 was as follows:

| | |
|---|---|
| 1973 | $344,110 |
| 1974 | 219,142 |
| 1975 | 264,949 |
| 1976 | 148,921 |
| 1977 | 712,338 |
| 1978 | 511,019 |

of objection by any OSG shareholder, the negotiation of the settlement at arm's length by the parties and the magnitude of the probable benefit to OSG from the Agreement—the court concludes that the proposed settlement is fair, adequate and reasonable. Accordingly, the settlement is approved.

### Attorney's Fees and Expenses

Counsel for plaintiff have submitted an application for attorney's fees and expenses in the amount of $400,000. Counsel for OSG have urged that allowances for plaintiff's counsel fees and expenses should be limited to $150,000.

The Court of Appeals has made clear that in granting fees, "the courts should avoid awarding 'windfall fees' and . . . they should likewise avoid every appearance of having done so." *City of Detroit v. Grinnell Corporation, supra,* 495 F.2d at 469. The application for fees in this case should be reviewed with an "eye to moderation." *Beazer v. New York City Transit Authority,* 558 F.2d 97, 101 (2d Cir. 1977).

■ An evaluation of the proper fees to be awarded must begin with a review of the hours worked by counsel multiplied by "a reasonable hourly rate to which attorneys of like skill in the area would typically be entitled for a comparable type of work." *Burger v. C.P.C. International, Inc.,* 76 F.R.D. 183, 188 (S.D.N.Y.1977). *See City of Detroit v. Grinnell Corporation,* 560 F.2d 1093, 1098 (2d Cir. 1977); *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir. 1973). This calculation establishes a "lodestar," or base figure from which adjustment may be made.

Counsel for plaintiff have submitted comprehensive affidavits concerning hours spent by particular attorneys and applicable billing rates on particular matters. Although the figures are uniformly reasonable, two minor adjustments are appropriate. The time worked by Mr. Bizar in reviewing the papers in the case after entering the litigation represents duplication and is disallowed. Also, the hourly rate charged by Mr. Schreiber for the last one hundred seventy hours of his time appears somewhat excessive and has been reduced. Following these adjustments, a lodestar figure of $175,067 is determined.

■ After consideration of the quality of work by counsel for plaintiff, the complexity of the issues, the risk of recovery and the resulting contingency of any fee, *City of Detroit v. Grinnell, supra,* 495 F.2d at 471; *Steinberg v. Carey, supra* at 480; *Frankenstein v. McCrory Corp.,* 425 F.Supp. 762, 767–68 (S.D.N.Y.1977), the court has determined that a bonus of ten percent is appropriate. The total award for attorney's fees, including the bonus, is $192,567.

The court also grants the application for expenses for payment of paralegals and accountants in the amount of $72,567. The bonus does not apply to these expenses. *Frankenstein v. McCrory, supra* at 769. Finally, incidental disbursements for photocopying and the like are granted in the amount of $7,475. The total award for attorney's fees, costs and expenses is $272,609. The tabulation is set forth in Appendix B.

Accordingly, the settlement proposed by the parties is approved. The petitions of counsel for an award of fees and expenses is granted in the amounts set forth herein. Counsel for plaintiff is directed to submit an order, on notice, within ten days.

IT IS SO ORDERED:

APPENDIX A

MOC MAXIMUM ALLOWABLE AFTER–TAX NET INCOME, 1979 TO 1988

| Year | Current Agreement | Proposed Settlement | Maximum Potential Savings |
|---|---|---|---|
| 1979 | $ 265,735 | $ 241,577 | $ 24,158 |
| 1980 | 292,308 | 241,577 | 50,731 |
| 1981 | 321,539 | 241,577 | 79,962 |
| 1982 | 353,693 | 265,735 | 87,958 |
| 1983 | 389,062 | 292,308 | 96,754 |
| 1984 | 427,968 | 321,539 | 106,429 |
| 1985 | 470,765 | 353,693 | 117,072 |
| 1986 | 517,841 | 389,062 | 128,779 |
| 1987 | 569,625 | 427,968 | 141,657 |
| 1988 | 626,587 | 470,765 | 155,822 |

APPENDIX B

I.    Attorney's Fees

| Names of Attorneys | Hourly Rates | Hours | |
|---|---|---|---|
| Schreiber | $150 | 656 | $ 98,400 |
| Kristol | 100 | 82.25 | 8,225 |
| Nogrosky | 65 | 14.5 | 942 |
| Weinberg | 100 | 50 | 5,000 |
| Bizar | 150 | 393 | 58,950 |
| Effel | 65 | 40 | 2,600 |
| Lawler | 45 | 21.3 | 950 |

| | |
|---|---|
| Total Fees Before Bonus | $175,067 |
| 10% Bonus | 17,500 |
| Total Fees Awarded | $192,567 |

II.    Expenses

| | |
|---|---|
| David Berdon & Co. | $ 72,038 |
| Leonard I. Schreiber | 5,855 |
| Pincus, Munzer, Bizar & D'Alessandro | 1,183 |
| Julia B. Levenson | 966 |
| Total Expenses | 80,042 |

III.   Total Award                     $272,609